# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| JOSEPH PAVLIK and DONNA SMITHEY on behalf of themselves, Universal Federal, and a class of FDIC certified Universal Federal claimants, | |
| Plaintiffs, | Case No. 10-cv-816 |
| v. | |
| | Honorable Amy J. St. Eve |
| FEDERAL DEPOSIT INSURANCE COMPANY in its Corporate and Receivership Capacity, ADAM RESNICK, | |
| Defendants, | |
| and | |
| THE ESTATE OF UNIVERSAL FEDERAL BANK, | |
| Nominal Defendant. | |

**PLAINTIFFS' PETITION FOR AN
AWARD OF ATTORNEY FEES**

## I. Introduction

Plaintiffs, former Universal Federal Savings Bank ("Universal") depositors, brought this case to recover both (1) their losses (and the losses other FDIC-certified creditors) from Adam Resnick's check-kiting scheme, which caused the Office of Thrift Supervision to seize, close, and sell Universal, plus (2) recognition of depositors' equity interest in Universal, to recover the FDIC's receipt of Adam Resnick's restitution produced from his separate whistleblower claim. Ultimately, Plaintiffs litigated the case, then negotiated a settlement under which the FDIC will distribute the restitution proceeds to (1) uninsured depositors, (2) other FDIC-certified creditors, (to make them whole plus interest thereon), and thereafter to (3) depositors as mutual owners, a total of approximately $1,026,829.30.

Plaintiffs hereby petition the Court to award counsel attorney fees in the amount of $375,000 as administrative expenses from the settlement fund Plaintiffs' counsel created. As described more fully herein, this amount is well-earned, represents a reasonable percentage of recovery and modest multiplier of the time and expense actually incurred by counsel, is appropriate and supported by all traditional theories for awarding fees, while still providing at least full recovery, and then some, for class members.

## II. Background

### A. Adam Resnick Causes Universal's Collapse Through a Check-Kiting Scheme

In 2001, self-proclaimed compulsive gambler, Adam Resnick (who was a defendant here until Sept. 14, 2010 (Dkt. 27)) perpetrated a check-kiting fraud that led to the FDIC's takeover of Nominal Defendant Universal Federal Savings Bank ("Universal"), which was a mutually-owned federal savings bank located at 1800 South Halsted Street, Chicago, Illinois. Universal was a small financial institution that began operating in 1923 and served the needs of residents in

the Pilsen community in Chicago from 1923 until it was closed by the FDIC in June 2002. Universal's deposits were FDIC insured.

Resnick was charged in 2005, eventually entering into a plea agreement (05-cr-0009; Dkt. 62) under which, on January 16, 2007, District Judge Wayne Andersen sentenced Resnick to forty-two months in prison and imposed a restitution obligation of approximately $10 million to the FDIC. (05-cr-0009; Dkt. 79)

After his check-kiting scheme at Universal Federal, but before being indicted, Resnick secured employment as a consultant at a company called U.S. Pharmacy. According to a motion filed in 05-cr-0009, during his time at U.S. Pharmacy, Defendant Resnick apparently became aware of significant heath care fraud, and initiated a False Claims Act whistleblower case.

### B. The FDIC Closes the Universal Federal Receivership

On November 15, 2007, despite still owing money to uninsured depositors (those whose deposits exceeded the $100,000 FDIC insurance guarantee)—and ignoring the depositors' interest in the corpus of the former Universal Federal, including the potential unpaid restitution award—the FDIC terminated the Universal Federal receivership, knowing that there may be restitution paid to Resnick.

The FDIC's termination of the Universal Federal receivership left numerous depositors and creditors unpaid or less than fully paid, leaving over $150,000 in losses for uninsured depositors (for deposits beyond the FDIC-insured amount) and creditors. Due to the deficit, no money remained of the bank's equity that would have represented depositors' equity ownership interest in Universal. Indeed, although mutual savings banks were all "structurally" owned by their depositors (similar to a co-op), there has apparently not been one in the history of the republic in which a liquidated mutual savings bank had produced an equity recovery for its

3

depositors. The FDIC closed the receivership/conservatorship, ending the depositor/owners' interests despite the potential that Resnick's restitution might produce a future recovery.

While Resnick was in prison, the whistleblower case proceeded to remarkable result. In November, 2009, $19.875 million dollars was collected from Omnicare Inc. to settle Resnick's *qui tam* action. Under federal law, Defendant Resnick was legally entitled to share in the award; his share totaling $5,402,687.95. After attorneys' fees and taxes, there was still in excess of $2,000,000 left, which was to be distributed under his restitution order to FDIC-corporate, since the FDIC as receiver had closed its Universal conservatorship.

Since the conservatorship had been closed, the money went to the FDIC in its corporate capacity, and would likely have been retained by the FDIC, but for this case.

If Plaintiffs never filed this case, the restitution paid to the FDIC would have been entirely absorbed into the FDIC in its *corporate* capacity, without consideration to the depositors and other rightful claimants, simply because the FDIC deemed that the Universal Federal receivership/conservatorship had long ago closed.

### C. Plaintiffs Bring This Action to Vindicate the Depositors' and Creditors' Rights

Plaintiffs, identifying that the FDIC would have a recovery from the restitution, sought the FDIC's agreement that the rest of the recovery belonging to depositors after recovery of the remaining losses, and brought this action on behalf of depositors, creditors and depositors as mutual owners to force the FDIC to pay over Resnick's restitution payments to those depositors and creditors pursuant to 12 U.S.C. §1821's priority schedule to:

  1) depositors' claims in excess of $100,000.00;

  2) Universal Federal's creditors, including retirees; and

  3) all additional proceeds to Universal Federal's depositors who were mutual

owners of Universal Federal at the time the bank went into receivership.

Basically, Plaintiffs brought the action to force the FDIC to either (1) re-open the Universal Federal receivership to distribute the Resnick restitution proceeds, or (2) distribute the Resnick restitution from FDIC corporate, as if the FDIC had reopened the receivership.

D. **After Document Discovery and Months of Negotiations, The FDIC Agreed to Distribute Resnick's Restitution Exactly How the Plaintiffs' Sought**

Plaintiffs filed their class action complaint on February 5, 2010. (Dkt. 1) On May 4, 2010, the FDIC filed a motion to dismiss, which was withdrawn after a 60 day stay. (Dkt. 13; 19) On September 1, 2010, the FDIC answered Plaintiffs' complaint, denying any further liability to depositors. See FDIC Answer, (Dkt. 22).[1] On September 15, 2010, Plaintiffs' moved to strike the FDIC's answer and affirmative defenses. (Dkt. 28). On October 5, 2010, this Court granted the motion with respect to the affirmative defenses and denied the motion with respect to the answers. (Dkt. 33). The FDIC produced discovery regarding Universal Federal's conservatorship/receivership.

Unable to get any real cooperation from the FDIC, Plaintiffs counsel Krislov engaged the Court's help in bringing the FDIC to negotiate. Thereafter, beginning on January 20, 2011, the parties engaged in four sets of settlement negotiations meditated by this Court in person on January 20, 2011, January 28, 2011, May 5, 2011 and June 10, 2011. These sessions were contentions and required extensive negotiation and number of critical issues, including, *inter alia*, (1) the language governing future payments to Universal's depositors' equity interest as

---

[1] *See* FDIC's Answer: Paragraph 11 (denying that the FDIC has to abide by the 12 U.S.C. 1821); Paragraph 23 (denying that the FDIC still owed money to depositors and that depositors have not been made whole); Paragraph 24 (denying that closing the receivership left depositors and creditors unpaid); Paragraph 31 (denying that "Plaintiffs request that this Court enforce this law and order the FDIC to pay claimants in order of priority"); Paragraph 42 (denying that the FDIC is required to follow the federal priority statute); Paragraph 48 (denying that depositors have an equity interest as owners).

mutual owners if Resnick is able to pay additional funds toward his restitution obligation; (2) the FDIC's attorneys' fees; (3) Plaintiffs method of keeping track of the FDIC's accounting for the Universal depositors' equity interest; and (4) the rights of the federal government threatening to lien portions, or all of the money, in the hands of the FDIC.

The parties also negotiated between settlement conferences and were able to reach an agreement for essentially the full relief Plaintiffs' sought: all of the FDIC restitution (reduced for the IRS's liened portion) to be distributed to the uninsured depositors, creditors, and depositors as mutual owners' equity in accordance with 12 U.S.C. §1821. (Dkt. 56) (Settlement Agreement, Exhibit A).

Under the settlement agreement, the FDIC agreed that Plaintiffs' counsel should be awarded fees for creating this fund, (Settlement Agreement ¶5) (Ex. A), in an amount determined by this Court. Herein, we offer the basis to support the Court's approval of $375,000 in attorney fees and costs.

### III. Basis for Fee Award

#### A. Criteria for Awarding Attorneys' Fees In Comon Fund Cases Are Well Established and Support of Fee of $375,000.00

When a case results in the creation of a common fund for the benefit of the plaintiff class, the common fund doctrine allows plaintiffs' attorneys to petition the court to recover its fees out of the fund. *Florin v. Nationsbank of Ga.*, *N.A.*, 34 F.3d 560, 562–63 (7th Cir. 1994).

A common fund case is one in which a litigant or lawyer recovers a common fund for the benefit of persons other than himself or his client. *Skelton v. General Motors Corp.*, 860 F.2d 250, 252 (7th Cir. 1988) (citing *In re Thirteen Appeals*, 56 F.3d 295, 305 (1st Cir. 1994)). In such a case, typically class actions, plaintiffs' attorneys, petition the court to recover their fees out of the fund. *Id*. (citing *Boeing v. Van Gemert*, 444 U.S. 472, 478 (1980); *Florin v.*

*Nationsbank of Georgia*, 34 F.3d 560, 563 (7th Cir. 1994)). The common fund doctrine is based on the notion that all plaintiffs who have benefitted from the litigation should share in its costs. *Id.*

While there is "'no one correct formula for determining a fee award,' there are two generally accepted methods for calculating the amount of fees that plaintiffs' counsel may recover from the fund: the lodestar method and the percentage-of-the-fund method." *Gaskill v. Gordon*, 1995 WL 746091, at *2 (N.D. Ill. Dec. 14, 1995) (citing *Evans v. City of Evanston*, 941 F.2d 473, 477 (7th Cir. 1991)). Under the lodestar method, the fee is calculated by multiplying the time reasonably expended on the case by a reasonable hourly fee with a multiplier (usually up to 3x to reflect risk and results. *See Id*. (citations omitted). Under the percentage of the fund method, the fee is calculated as a reasonable percentage (typically 25%-33 1/3%) of the fund created.

In its discretion, the Court may choose to use either approach, sometimes both, as a means to find an appropriate figure. The decision to use a percentage method or a lodestar method remains in the discretion of the district court, *id*., (citations omitted), but the percentage-of-the-fund method is most often found to be the appropriate method of calculating fees. *See In re Continental Ill. Sec. Litig.*, 962 F.2d at 572; *In re Synthroid Marketing Litigation*, 264 F.3d 712, 718 (7th Cir. 2001). The lodestar times multiplier method, however, "remains useful as a baseline even if the percentage method is eventually chosen" because it serves as "a 'cross-check' on the reasonableness of the requested percentage." *In re AMF Bowling*, 334 F. Supp. 2d 462, 467 (S.D.N.Y. 2004) (noting that lodestar fees used to confirm the percentage-of-the-fund fees "need not be exhaustively scrutinized by the district court.... Instead, the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case (as well as encouraged

7

by the strictures of Rule 11)") (citations omitted).

It is the Court's duty to ensure that the attorneys are paid a reasonable fee. *See In re Continental Ill. Sec. Litig.*, 962 F.2d at 572-73. When attorneys petition for compensation from a fund created for their clients' benefit, the court "becomes the fiduciary for the fund's beneficiaries and must carefully monitor disbursement to the attorneys." *Skelton v. Gen. Motors Corp.*, 860 F.2d at 253.

Here, it is appropriate for the Court to use the "common fund" standard because Plaintiffs' counsel created a significant benefit for Universal's depositors and receivership claimants, with full recovery obtained for Universal's uninsured depositors and creditors, as well as a cash benefit for depositors as mutual owners. Plaintiffs' requested fee here, $375,000, is approximately 36% of the net distribution to depositors, excluding the FDIC's $592,148.34 subrogation reimbursement (for the FDIC's Depositor Insurance Fund payment to insured depositors up to $100,000) and $40,000 for the FDIC's attorneys' fees, plus a $745,000 benefit liened by the IRS by this case. Including the benefit conferred on the FDIC and IRS, Plaintiffs' attorneys' fees would equal about 15.8% of the total fund.

Despite the FDIC closing Universal Federal's receivership, Plaintiffs filed a well-pleaded class action complaint and adroitly pursued the claim, through motion practice, discovery and extensive negotiations that ultimately led to full recovery for the class' losses.[2]

    **B.**    **The Requested Attorney's Fee Award Constitutes 36.5% of the Fund Distributed to Uninsured Depositors, Creditors, and Depositors as Mutual Owners and Falls Well Within the 20%-50% Range for Percentage of Fund Cases**

Plaintiffs' counsel requests a fee award of 36.5% of the actual cash distributed to FDIC certified claimants. This fee falls within the normal market range of 20%-50% of the common

---

[2] As this Court is aware, the IRS asserted a claim on the fund for unrelated tax liens for Adam Resnick.

fund awarded in numerous cases of this size. As this Court recently noted in *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, — F. Supp. 2d —, 2011 WL 2173746, at *1 (N.D. Ill. June 2, 2011) ("*AT&T*"), the reasonableness of the fee should be determined by the market rate at the time: "[t]o determine the reasonableness of the sought-after fee in this, a common-fund, case, 'courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time.'" *Id.* (granting a 20% of cash recovered fee in a "megafund case" where fee percentage are often lower) (citing *In re Synthroid Mktg. Litig.*, 264 F.3d at 718).

Similarly, Judge Gettlemen explained in *In re TransUnion Corp. Privacy Litigation*, that regardless of whether this Court uses a common-fund method or lodestar method, Plaintiffs' counsel should be paid market price for their services based on the complexity and risk involved:

> [I]n the Seventh Circuit, the market controls. Thus, the Seventh Circuit is less concerned with the choice between the lodestar or percentage method than with approaching the determination through the lens of the market. The analysis should be determined from what an arms-length negotiation between the class and the lawyers at the beginning of the case would have likely produced.

*In re Trans Union Corp. Privacy Litig.*, No. 00 C 4729, 2009 WL 4799954, at *9 (N.D. Ill. Dec. 9, 2009) (citing *In re Synthroid Marketing Litig.*, 264 F.3d at 718-19). Therefore, "when deciding on appropriate fee levels in common-fund cases, courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Id.* (citing *Synthroid* at 718).

And as Judge Wilkerson explained in *Meyenburg v. Exxon Mobil Corp.*, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006), "the appropriate manner of setting a fee is to look to the market rate. The Court is independently aware that 33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial

9

litigation." *Id.* (citing *Teamsters Local Union No. 604 v. Inter-Rail Transp., Inc.*, 2004 WL 768658, at *1 (S.D. Ill. Mar. 19, 2004)). There, the judge looked to class counsel's agreement with the named Plaintiffs, which "call[ed] for the payment of a one third of any recovery fee inclusive of costs" and held that counsel's fee request was "well below what it could have and did negotiate in comparable commercial litigation." *Id.* Here, the contingent fee agreement is for 33 1/3 % plus costs.

Further, "[t]hirty three percent appears to be in line with what attorneys are able to command on the open market in arms-length negotiations with their clients." *Goldsmith v. Tech. Solutions Co.*, 1995 WL 17009594, at *8 (N.D. Ill. Oct. 10, 1995) (citing *In re Continental Illinois Sec. Litig.*, 962 F.2d at 572 where Judge Posner suggested that the percentage method 'might save time and expense for everyone.' and that "the usual range for contingent fees in personal injury cases is between 33% and 50%." *Id.* (citing *McKinnon v. City of Berwyn*, 750 F.2d 1383, 1393 (7th Cir. 1984) (40% is common)).

Indeed, numerous courts have found that fee awards totaling 50% of the fund are within the permissible range of awards for recoveries of this size, especially where supported by the lodestar time and costs expended. *See*, *e.g.*, *McDonald v. Chicago Milwaukee Corp.*, 565 F.2d 416, 434-35 (7th Cir. 1977) (holding district court did not err in approving settlement in which plaintiff's counsel sought up to 50% of the fund be awarded to counsel for fees and expenses); *In re Telectronics*, 137 F.Supp.2d 1029, 1046 (S.D. Ohio 2001) (noting the range of reasonable attorney fee awards has been designated as between 20% and 50% of the common fund); *Spicer v. Chicago Board Options Exchange, Inc.*, 844 F. Supp. 1226, 1252 (N.D. Ill.1993) (finding that attorney fee awards typically range from 20% to 50% of the settlement fund); *In re Warner Communications Sec. Litig.*, 618 F. Supp. 735, 749 (S.D.N.Y. 1985) ("Traditionally, courts in

this Circuit and elsewhere have awarded fees in the 20%-50% range in class actions.") (citations omitted); *Zinman v. Avemco Corp.*, 1978 WL 5686 (E.D. Pa. Jan. 18, 1978) (granting $130,000 fee award from $260,000 settlement based on lodestar fees).

This Court's *AT&T* decision also used empirical data to decide the common fund fee, specifically, "Brian Fitzpatrick studied every federal class-action settlement in 2006 and 2007." *AT&T* at *4 (citing Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811 (2010)). "He found that for cases involving settlements greater than $72.5 million, the mean fee award was 18.4% and the median was 19%." *Id.* In the same study, cases for this size (between $750,000.00 and $1,750,000) had a mean percentage of 28.7% and a median percentage of 30%. The fee request here is just above the 30% median.

Finally, it is notable that both Plaintiffs signed contingent fee agreements approving a fee of 33 1/3% of the recovery plus out-of-pocket costs.

> C. **This Court's Analysis Based on Risk of Nonpayment, Performance, Continued Work on the Case, Number of Lawyers Involved, and Other Relevant Factors Also Favors the Requested Fee**

This Court's decision in *AT&T* also considered: (1) the significant risk of nonpayment that Counsel undertook in bringing the claim; (2) Counsel's performance throughout this case, (3) the substantial amount of work that remains for Counsel to undertake, (4) the number of lawyers involved in carrying out the Settlement, and (5) other relevant factors that justify such an award. *AT&T* at *7. These factors also support the requested fee here.

> 1. **The Risk of Nonpayment Here Was Significant Because of the Case's Novelty**

There are a number of reasons that Plaintiffs' counsel risked nonpayment of *any* fees for this litigation. As the FDIC has admitted, a case of this nature (recognizing ownership rights of

11

depositors in mutual savings banks) has never previously been brought. This case is complex in that it deals with restitution, banking, and shareholder issues, complicated by the mutual savings bank entity concept and whether it would be recognized at all let alone long after the receivership/conservatorship had been closed, against a well-funded adversary. Plaintiffs faced a number of procedural and substantive hurdles in succeeding here on a legal basis. And, Courts' ability to review FDIC actions is extremely limited by statute. *See Courtney v. Halleran*, 485 F.3d 942 (7th Cir. 2007) (in which the same counsel's challenge to the FDIC's violation of statutory priorities was turned away). There also were possible statute of limitations issues because Universal's 2002 close was 9 years earlier. And, the FDIC's closing the Universal receivership presented a difficult theory from a shareholder/corporate governance perspective in that shareholders of defunct corporations often cannot recover the corporation's assets once those assets are, basically, abandoned, or sold, as the FDIC treated the Resnick restitution here.

This factor weighs in favor of the requested fee.

### 2. Plaintiffs' Counsel's High Quality Work Resulted in This Recovery

Plaintiffs' work here resulted in full recovery for FDIC-certified claimants and a cash payment of Universal's depositors as mutual owners. This significant recovery in a novel case shows that Plaintiffs' counsel research and work identified actionable claims, filed a well-pleaded complaint, and succeeded.

      *a.    Plaintiffs Filed an Extensive Complaint For a Declaratory Judgment Against an Uncooperative Government Entity*

Plaintiffs engaged in extensive research in filing a claim against the FDIC and Adam Resnick. To research the complaint, counsel had to research FDIC regulations, statute of limitations issues and factual issues for facts that took place in 2001. The Complaint was a two-count hybrid class and derivative complaint seeking a declaratory judgment forcing the FDIC

actually come to grips with the issues of whether mutual bank depositors are actually equity owners and to distribute the Resnick restitution to Universal Federal's uninsured depositors, creditors, and depositors as mutual owners. The two-count complaint detailed the Resnick fraud as well as the FDIC's action after the OTS closed Universal.

> b. *The FDIC's Motion to Dismiss, Answer, and Plaintiffs' Motion to Strike*

On May 4, 2010, the FDIC moved to dismiss this case on the grounds of ripeness and failure to state a claim. (Dkt. 13). Plaintiffs, after analyzing the brief, believed that this motion had no merit, and were set to brief the motion when this Court stayed the case pending the FDIC receiving the restitution proceeds, denying the FDIC's motion to dismiss. (Dkt. 18). On May 24, the parties served their initial disclosures. After this Court stayed the case, the FDIC answered Plaintiffs' complaint and asserted two affirmative defenses. After considerable analysis, in Plaintiffs' view, the answer and affirmative defenses were deficient under Rule 8, and Plaintiffs' promptly filed a motion to strike on September 15, 2010, arguing, *inter alia*, that the FDIC had to respond to "legal conclusions" and that the affirmative defenses "inappropriately parrot the Rule 12(b)(6) motion to dismiss standard." (Dkt. 28).

Ultimately, the Court granted Plaintiffs' motion to strike for the affirmative defenses, but denied Plaintiffs' motion for the FDIC's answer.

> c. *Discovery Process with an Uncooperative FDIC*

On September 28, 2010, Plaintiff issued its first set of requests for production of documents and interrogatories seeking information about the actual accounting for Universal Federal's receivership. The FDIC asked us to stay discovery while the parties waited three months to hold a settlement conference due to the FDIC's schedule. Plaintiffs refused, and pushed forward to written discovery. Plaintiffs' refusal was for good reason. Only after

analyzing the documents the FDIC produced did Plaintiffs' have enough information to legitimately make a settlement demand.

> d. *Negotiations that Led to the Settlement Took 6 Months And Plaintiffs Were Forced to Consider Numerous "Final Offers"*

After numerous attempts to enter into settlement negotiations without involving this Court, on September 23, 2010 (Dkt. 30), Plaintiffs asked this Court to hold a settlement conference with the parties to try and resolve the case. Originally, the settlement conference was scheduled for November 15, 2010, but at the FDIC's request, was rescheduled to January 20, 2010. (Dkt. 35). On January 20, 2010, with Plaintiff Smithey appearing in person, the Court held a settlement conference where many of the issues were worked out, but the FDIC needed extra time to "get approval." The parties returned to the Court's chambers for an additional settlement conference on January 28, 2011. After that conference, the FDIC provided a first draft of the proposed settlement agreement. The drafting process demonstrated that many issues remained outstanding, including, (1) the language governing future payments to Universal's depositors as mutual owners if Resnick was able to pay additional funds toward his restitution obligation; (2) the FDIC's attorneys' fees; and (3) Plaintiffs method of keeping track of the FDIC's accounting for the Universal depositors' equity interest.

Negotiations over the settlement agreement lasted over 6 months, with the Court, on May 5, 2011, and June 10, 2011, again bringing the parties in for settlement conferences. Complicating the negotiations was the FDIC's constant "final offer" proposals that put the settlement terms in jeopardy. Further, the IRS, on May 2, 2011, asserted a lien on the FDIC funds for Resnick's outstanding tax liabilities for 2001 and 2002. Plaintiffs attempted to convince the IRS to drop the tax lien, or in the alternative, force the FDIC to refuse to honor the lien. In contrast, the Department of Justice, Tax Division's response was to threaten the entire

recovery. Mindful of the clients' interests and with their approval after consultation as well as recognizing that there was a significant recovery for depositors' equity ownership that those depositors may not have expected, Plaintiffs agreed to the settlement.

On June 10, 2011, this Court brought the parties in for a final settlement conference. At that settlement conference the parties worked towards and final settlement agreement and in the days after that conference came to an agreement. (Ex. A). Plaintiffs' counsel, with Plaintiffs Smithey's and Pavlik's approval, executed the agreement on June 17, 2011.

### 3. The Amount of Work Necessary to Resolve this Litigation Also Weighs in Favor of the Requested Fee

Universal's uninsured depositors, creditors, and depositors as mutual owners would have received nothing without Plaintiffs' counsel's diligent and persistent work. Instead, Plaintiffs' counsel secured a full recovery for the uninsured depositors and creditors as well as an additional payment to all of the depositors for those depositors' equity interest in Universal.

As demonstrated above, Plaintiffs' counsel put substantial time and effort into researching, bringing, and resolving this case effectively and efficiently for Universal's depositors, creditors and depositors as mutual owners. Without the amount of high quality work that Plaintiffs' counsel performed here, this fund would not exist.

### 4. The Settlement Agreement Requires that Counsel Continue to Monitor Payments to the FDIC.

This Court, in *AT&T* at *11, took into consideration that Plaintiffs' counsel had to engage in additional work after the settlement was approved and the fees paid. Although in *AT&T*, counsel was "likely to spend tens of thousands of hours administering this settlement," here, as the Settlement Agreement ¶11 shows, Plaintiffs' counsel has to monitor Resnick's activities and the FDIC's Universal Federal account for the next 18 years.

15

### 5. The Number of Lawyers Involved In Obtaining the Recovery

Here, one law firm was involved in obtaining the significant recovery. Unlike many cases, where multiple firms lead to duplicative expenses, counsel prosecuted this case efficiently and successfully, with no more than two attorneys working on this case.

### D. Even After the Requested Fee Award Is Granted, the Remaining Fund Produces Full Compensation for Losses Plus Remarkable Additional Compensation for All Depositors' Equity Ownership Interest in the Now Defunct Universal Federal, as Well As Future Possible Compensation for Depositors.

This Court should also grant the requested fee award because, *even after granting counsel's requested fee award*, uninsured depositors and creditors will receive not just *full reimbursement*, plus interest, for their losses, but depositors will also reap substantial cash from their ownership stake. Plaintiffs' counsel has achieved the objective of this litigation – to fully compensate the uninsured depositors and creditors, and force the FDIC to recognize the ownership equity interests of depositors of mutual savings banks. Therefore, with these results, Plaintiff's counsel's requested fee award is indisputably reasonable and appropriate.

## IV. Plaintiffs' Counsel's Lodestar Also Supports the Requested Fee Here

Similar to *AT&T*, the percentage-of-fund calculation is sufficient to support the requested fee here, and "[t]he Court does not need to resort to a lodestar calculation, which would be costly to conduct, to reinforce the same conclusion." *Id*. at 11 (citing *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir. 1994); *Will v. Gen. Dynamics Corp.*, No. 06–CV–698, 2010 WL 4818174, at *3 (S.D. Ill. Nov. 22, 2010) ("The use of a lodestar cross-check in a common fund is unnecessary, arbitrary, and potentially counterproductive."); *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 526 n. 10 (1st Cir. 1991) ("We are aware of the tendency exhibited by some courts, particularly in common fund cases, to jettison the lodestar in favor of a 'reasonable

percentage of the fund' approach.")). As shown by the attached Exhibit B, the unimproved lodestar at our usual market rates totals $242,848.89; to which the requested $375,000 represents a modest multiplier of 1.54.

Nevertheless, if the Court is inclined to look to Plaintiffs' counsel's time, in common fund cases, the requested fee is amply supported on a lodestar-plus-multiplier approach.[3] Plaintiffs' counsel's lodestar here is $239,410.90 in fees and $3,417.99 in costs, totaling $242,848.89.

In *Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998), the Seventh Circuit held that "[o]ur cases hold that the district court must award a multiplier when attorney's fees are contingent upon the outcome of the case (*i.e.*, there is the possibility that the attorney will not receive any fee). *Id.* (citing *In re Continental*, 962 F.2d at 569; *Harman*, 945 F.2d at 976). *Cook* also states that multipliers as high as 2 were acceptable: "We also have speculated that a multiplier of 2 may be a sensible ceiling." *Id*. (citing *Skelton*, 860 F.2d at 258). Multipliers up to 3 are routinely approved as reasonable. *Sampson v. Eastman Kodak Co.*, 552 N.E.2d 1194, 1196 (Ill. App. Ct. 1990) ("Herbert B. Newberg, author of the well-known treatise on class actions, testified that in his opinion a reasonable fee would be the lodestar multiplied by three and one-half to four and that the requested fee of $6 million readily falls at the modest end of the reasonable range of fee awards in cases of common fund recoveries of comparable magnitude and risk.") and *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988) ("The range of lodestar multiples in large and complicated class actions runs from a low of 2.26 [citation omitted] to a high of 4.5") (collecting cases).

Even though this Court need not use Plaintiffs' counsel's lodestar as further support for

---

[3] In fee-shifting cases, a multiplier is never used, whereas it is required in common fund cases. *See Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir. 1998)

17

its requested fee, the requested fee's reasonableness is thus supported by the lodestar x multiplier theory as well.

V.      **This Court Should Award a $5,000 Incentive Award Each to Plaintiffs Smithey and Pavlik**

In addition to Plaintiffs' counsel's requested fees, Plaintiffs ask that this Court award them a $5,000 incentive award each for Plaintiffs' Pavlik and Smithey from the common fund. This circuit has continually recognized the appropriateness of incentive awards, which are designed to encourage individuals to become named plaintiffs. *See Gaskill v. Gordon*, No. 88 C 3404, 1995 WL 746091, at *4 (N.D. Ill. Dec. 14, 1995) and *Meyenburg v. Exxon Mobil Corp.*, No. 3:05-cv-15-DGW, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006).

As this Court stated in *AT&T* "[i]ncentive payments sufficient to induce a named plaintiff to participate in the lawsuit are appropriate within the Seventh Circuit. *Id.* at 12 (citing *In re Cont'l Ill. Secs. Litig.*, 962 F.2d 566, 571 (7th Cir.1992)). In *AT&T*, despite no formal discovery, this Court found that a "$5,000 award [was] appropriate." *Id.* (citing *Hopson v. Hanesbrands, Inc.*, No. 08–CV–844, 2009 WL 928133, at *10 (N.D. Cal. Apr.3, 2009) ("In general, courts have found that $5,000 incentive payments are reasonable."); and *Equal Rights Crt. v. Wa. Metro. Area Transit Auth.*, 573 F. Supp. 2d 205, 214 n. 10 (D.D.C.2008) ("The incentive awards of $5,000 and $1,000 granted to named plaintiffs and deposed class members are not uncommon in class action litigation.")) (other citations omitted).

When Pavlik and Smithey learned that restitution was being paid to the FDIC in connection with Universal's failure, they alone among depositors, decided to bring this case, and not only for themselves, but for all Universal's depositors and creditors too. Both Pavlik and Smithey reviewed and made comments on the complaint, as well as reviewed multiple drafts of the settlement agreement. Plaintiff Smithey also personally attended 2 of the settlement

18

conferences held with this Court, and actively participated. Both regularly communicated with counsel and were committed to being deposed, and testifying at trial if necessary. *See AT&T* at *13(where this Court held that plaintiffs' roles "in reviewing, considering, and approving the Settlement Agreement and fee application, and especially their willingness to take a more-active role if necessary, warrants a $5,000 reward.") .

Incentive awards in cases such as this are appropriate and important. *See* Clinton A. Krislov, *Scrutiny of the Bounty: Incentive Awards for Plaintiffs in Class Litigation*, Illinois Bar Journal (June 1990). Both Pavlik and Smithey, especially, took substantial time out of their schedules to actively participate in this litigation, standing up for their fellow Universal depositors. Because, often, incentives to bring class cases are low—especially against federal government entities—individuals should be encouraged to prosecute cases that help others achieve justice by compensation.

## CONCLUSION

Plaintiffs' counsel obtained a significant recovery for Universal Federal's former depositors, creditors, and depositors as mutual owners through navigating complicated legal grounds and a sophisticated defendant. Plaintiffs respectfully request that this Court award their counsel $375,000 of the common fund created by Plaintiffs' counsel, for FDIC-certified uninsured depositors and creditors as well as a cash payment to depositors for their equity interest, is well within the range of market price for contingent legal services and is commensurate with Plaintiffs' fees and expenses incurred here.

Dated: July 8, 2011                         Respectfully submitted,

                                                        s/Clinton A. Krislov
                                                        Clinton A. Krislov
                                                        Jeffrey M. Salas
                                                        KRISLOV & ASSOCIATES, LTD.

20 North Wacker Drive, Suite 1350
Chicago, Illinois 60606
Tel.: (312) 606-0500
Fax: (312) 606-0207

## PROOF OF SERVICE

    I, Clinton A. Krislov, an attorney, state that I caused a copy of the foregoing Plaintiffs' Petition for an Award of Attorney's Fees to be delivered via the Court's electronic filing system to the counsel below.

                                                                                               __s/Clinton A. Krislov_____
                                                                                               Attorney for Plaintiffs

**SERVICE LIST:**

Barbara Katron
Larry Goodman
Federal Deposit Insurance Corporation
3501 Fairfax Drive, Room VS D 7122
Arlington, VA 22226
Tel. 703-562-2390
Fax. 703-562-2481